ACCEPTED
12-15-00176-CR
TWELFTH COURT OF APPEALS
TYLER, TEXAS
12/4/2015 11:21:16 AM
Pam Estes
CLERK

_____

**12-15-00176-CR**

RECEIVED IN
12th COURT OF APPEALS
TYLER, TEXAS
12/4/2015 11:21:16 AM
PAM ESTES
Clerk

**IN THE COURT OF APPEALS
FOR THE TWELFTH APPELLATE DISTRICT
TYLER, TEXAS**

**FILED**

12/4/2015

**Twelfth Court of Appeals
Pam Estes
Clerk**

**RANDY EARL CRAWFORD
v.
THE STATE OF TEXAS**

_____

**APPEAL FROM THE 217TH JUDICIAL DISTRICT COURT
OF ANGELINA COUNTY, TEXAS**

_____

**BRIEF OF APPELLANT
RANDY EARL CRAWFORD**

_____

Respectfully, Submitted:

*/S/ John D. Reeves*

JOHN D. REEVES
Attorney at Law
1007 Grant Ave
Lufkin, Texas 75901
Phone: (936) 632-1609
Fax: (936) 632-1640
SBOT # 16723000
Email: tessabellus@yahoo.com
**ATTORNEY FOR APPELLANT**

**ORAL ARGUMENT NOT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

**Parties:**
Appellant in Trial Court:

Randy Earl Crawford #2010594
8101 F.M 969
Austin, Texas 78724

**Trial and Appellate Counsel**:

**Appellant**:

Trial and Appellate:
John D. Reeves
Attorney at Law
1007 Grant Ave.
Lufkin, Texas 75901
Phone: (936) 632-1609
Fax: (936) 632-1640
SBOT # 16723000

**Appellee**:

April Ayers-Perez
Angelina County Dist. Atty
P.O. Box 908
Lufkin, Texas 75901
Phone: 936-632-5090
SBOT# 24090075

**Trial** Scott Greenbaum
Angelina County Dist. Atty
P.O. Box 908
Lufkin, Texas 75901
Phone: 936/ 632-5090
SBOT# 24043703

ii.

# TABLE OF CONTENTS

Page:

IDENTITY OF PARTIES AND COUNSEL…………………………………….ii

TABLE OF CONTENTS………………………………………………...iii

INDEX OF AUTHORITIES…………………………………………….....iv

STATEMENT OF THE CASE………………………………………...1-2

STATEMENT OF JURISDICATION………………………………........2

ISSUE PRESENTED……………………………………………….......2

STATEMENT OF FACTS …………………………………………….2-27

SUMMARY OF THE ARGUMENT …………………………………...27-28

ARGUMENT……………………………………………………….28-34

CONCLUSION AND PRAYER………………………………….....34

CERTIFICATE OF COMPLIANCE...............................................34

CERTIFICATE OF SERVICE……………………………………........35

# INDEX OF AUTHORITIES

## U.S. SUPREME COURT CASES

Jackson v. Virginia, 443 U.S. 307 (1979) .....................................................29,30

## TEXAS CASES

Chambers v. State, 805 S.W.2d 459, (Tex. Crim. App. 1991)................................29

Escobedo v. State, 6 S.W. 3d 1, (Tex. App.- San Antonio 1999, pet. ref'd)...........30

Hooper v. State, 214 S.W.3d 9, (Tex. Crim. App. 2007)......................................29

Johnson v. State, 967 S.W.2d 410, (Tex. Crim. App. 1998)..................................33

Jones v. State, 814 S.W.2d 801, 803 (Tex. App.—Houston [14th Dist.]
1991, no pet.). ..................................................................................................30

Keeton v. State, 803 S.W. 2d 304, 305, (Tex. Crim. App. 1991) .......................... 30

Lacour v. State, 8 S.W. 3d 670, (Tex. Crim. App. 2000)........................................30

Lucio v. State, 351 S.W.3d 878,  (Tex. Crim. App. 2011)....................................29

Moreno v. State, 755 S.W. 2d 866, (Tex. Crim. App. 1988)..................................33

Mosley v. State, 983 S.W.2d 249, (Tex. Crim. App. 1998)...................................33

Smiles v. State, 298 S.W.3d 716, (Tex. App.-Houston 2009, no pet.)..............21,32

Sullivan v. State, 701 S.W. 2d 905, 908 (Tex. Crim. App. 1986) ..........................30

## RULES AND OTHER AUTHORITIES

Tex. Penal Code. Sec. 31.03 (West 2011). ......................................................28,30

Texas Penal Code Sec. 31.08 (West 2011) .............................................21,27,29,32

iv.

12-15-00176-CR

_____

IN THE COURT OF APPEALS
FOR THE TWELFTH APPELLATE DISTRICT
TYLER, TEXAS

_____

RANDY EARL CRAWFORD
v.
THE STATE OF TEXAS

_____

APPEAL FROM THE 217TH JUDICIAL DISTRICT COURT
OF ANGELINA COUNTY, TEXAS

BRIEF OF APPELLANT
RANDY EARL CRAWFORD

TO THE HONORABLE COURT OF APPEALS;

## STATEMENT OF THE CASE

The appellant was tried for the offense of Theft over the value of $ 1,500 or more but less than $20,000 as alleged in the indictment. (CR p.16)  Appellant was charged by indictment in the July/September 2014 term of the Angelina County Grand Jury. The appellant pled not guilty and a jury trial was held on April 28th,

2015. (CR pg. 6; RR Vol. 3) Jury selection occurred on April 20th, 2015. 2014. (RR Vol. 2) There were no objections to the final jury panel. (RR Vol. 2) The sentencing occurred on June 25th, 2015. (RR Vol. 4). After hearing evidence the jury found the appellant guilty and after a sentencing trial the trial court sentenced the appellant to fifteen (15) years in the ID- TDCJ. (RR Vol. 4 p. 58-59) There were two enhancement counts the appellant pled true to. (RR Vol. 4 p. 4-6) Notice of Appeal was filed on June 26th, 2015. (CR p. 87) Attorney John Reeves was appointed to do the appellant's appeal on June 26th, 2015. (CR p. 86) A nunc pro tunc judgment was signed on July 11, 2015. (CR p. 92-93)

## STATEMENT OF JURISDICTION

The Trial Court Certified Appeal for permission Appellant's unlimited right to appeal on September 9th, 2015 giving appellant unlimited appeal. (Sup. CR. p. 5-6)

## ISSUES PRESENTED

1. The evidence is legally insufficient to sustain the jury's finding of appellant's guilt for the offense of theft classified as a State Jail Felony.

## STATEMENT OF FACTS

The case was called for trial upon an indictment charging appellant with

2.

unlawfully appropriating by acquiring or otherwise exercising control over property, to wit: an AC unit of the value of more than $1,500 but less than $20,000 from Shady Chapel Church, the owner thereof, without the effective consent of the owner and with the intent to deprive the owner of said property, wherein the appellant entered a plea of not guilty. (RR Vol. 3, p. 12-13) The testimony considered by the jury on the guilt/innocence consisted of six witnesses beginning with the testimony of Deputy Biggerstaff of the Angelina County Sheriff's Department. (RR Vol. 3, p. 24-33)

Deputy Biggerstaff testified he had been a law enforcement officer for about nine years, with Angelina County Sheriff's Department a little over a year, and was a patrol deputy at the time of this incident. (RR Vol. 3, p. 25) On May 29, 2014, the witness was dispatched to the parsonage of Shady Chapel Church and spoke with Wanda Guidry who told him that the outside air conditioning unit had been stolen sometime in the prior week, and that they knew the unit had been there on May 22, 2014. (RR Vol. 3, p. 26) The Deputy viewed the slab where an air conditioning unit usually sits, and noted the pipes that were attached to the unit had been cut. He spoke with "them" to ascertain possible suspects and witnesses, but none were provided. He also asked what the replacement cost might be, and looked for usable evidence, but did not see any evidence. (RR Vol. 3, p. 27) At that time, Ms. Guidry did not have the make, model or serial number for the unit. The Deputy stated that he forwarded his initial report to the criminal investigation division. (RR Vol. 3, p. 28)

On cross-examination, Deputy Biggerstaff testified that church personnel stated the last time they replaced the unit, the cost approximately $5,000, but believed that price included the interior and exterior unit. (RR Vol. 3, p. 29) The Deputy stated he could not locate any fingerprints or footprints and did not take

3.

any pictures of the scene. (RR Vol. 3, p. 30) The Deputy stated that church personnel provided the name of a person with the last name of Francis who lived in the area and had stolen items before that may have been involved. (RR Vol. 3, p. 31)

Wanda Guidry, a resident of Zavalla, Texas, and janitor of Shady Chapel United Methodist Church was called as the next witness. (RR Vol. 3, p. 33-46) On May 29, 2014, she testified that she noticed the air conditioner was missing outside the parsonage (RR Vol. 3, p. 33-35) State's Exhibit 1, a photograph of the church was admitted. Once Ms. Guidry noticed that the air conditioning unit was missing, she called law enforcement and then Charlie Horsack. Ms. Guidry testified that Charlie Horsack, his wife and another trustee came to the church. (RR Vol. 3, p. 35-36) Mr. Guidry stated that she had told Deputy Biggerstaff to consider Mr. Francis because "we were having a lot of problems with the children, his children. They were being trained, we felt like, to go around and steal stuff. They would want to look for a job, and they would go in and look – take stuff, and we knew that." (RR Vol. 3, p. 37) Ms. Guidry stated that she had taken pictures with her cell phone and emailed them to Mr. Horsack. (RR Vol. 3, p. 38)

On cross-examination, Ms. Guidry stated that she was concerned about the Francis family because the children were going from house to house looking for jobs. The Francis family had eight children, but four or five were living at the home located near o the church. The witness testified that Francis family was renting a home from Hazel, appellant's mother, and there were several nearby businesses including two RV parks. (RR Vol. 3, p. 39-40) Ms. Guidry stated that it was common knowledge in the community that Francis had just gotten out of prison. (RR Vol. 3, p. 41) The witness testified that the missing air conditioner was installed in 2012. (RR Vol. 3, p. 43)

4.

On redirect examination, Ms. Guidry stated that the appellant lived in her neighborhood, approximately two and a half miles from the church. The witness stated that the appellant's family attended the church for a while and were familiar with the church grounds. (RR Vol. 3, p. 44-45)

Charles Horsack, the chairman of trustees of the Shady Chapel United Methodist Church, was called to testify. (RR Vol. 3, p. 46-65) On May 29, 2014, Ms. Guidry called him to ask whether the air conditioner had been moved to the church's storage building because it was missing. The witness stated that the parsonage had become vacant and the church was considering selling it. Mr. Horsack stated that he and another trustee, Darrell, visited the parsonage and met with the Deputy Biggerstaff. (RR Vol. 3, p. 47-48)

State's Exhibit No. 5, a document identifying the air conditioner's serial number and model number, was admitted. (RR Vol. 3, p. 49-50) Mr. Horsack testified that Parker Refrigeration informed him it would cost $2,112 to replace the missing unit. State's Exhibit No. 6, an estimate of replacement cost issued by Parker Refrigeration, was admitted. Mr. Horsack stated that there would be additional costs for installation. (RR Vol. 3, p. 51-52)

State's Exhibit Nos. 2, 3, and 4, printouts of several websites selling the same air conditioning units were introduced. The cost of the unit on the Amazon website was $1,909 plus $200 shipping, on the AC outlet website was $1,909, and on eBay was $2,699. (RR Vol. 3, p. 52-54)

On voir dire examination, Mr. Horsack stated that he did not collect or seek out the estimates identified as State's Exhibit Nos. 2 through 4. He had never seen these documents before. Defense attorney objected to State's Exhibit Nos. 2 through 4, that the witness could not sponsor said exhibits. Prosecution argued that the cost of the unit is a disputed matter, that the witness did not formulate these

5.

quotes, that the quotes were researched and obtained by the prosecution. Defense attorney objected to the prosecution testifying before the jury. The court asked for the prosecution's response to defense attorney's objection that the witness could not sponsor said State's Exhibits. The prosecutor stated that the witness has personal knowledge of the unit, and he knew the model number of the unit. (RR Vol. 3, p. 54-56)

At bench conference, the Prosecutor suggested that he could ask the witness additional identifying questions. The Court stated that the prosecution could ask additional questions, but that the Court would have a hard time admitting the Exhibits, since the Prosecution already established value. (RR Vol. 3, p. 56)

On direct examination, Mr. Horsack reiterated that he had obtained the estimate, State's Exhibit No. 6, being $2,112, for the unit, which did not include fees for installation. (RR Vol. 3, p. 57) Mr. Horsack stated he had contacted the Angelina County Sheriff's Department to provide the unit's serial number and model number.

On cross-examination, Mr. Horsack stated that the church council had not addressed the cost of replacing the unit as they were being optimistic that the unit would be recovered. (RR Vol. 3, p. 61) Mr. Horsack testified that as he understood it, State's Exhibit No. 6 provided an estimate for replacing the air conditioner with a new, same model unit. Defense attorney asked the witness whether the value of the new unit would be the same as a two-year old unit. Prosecution objected stating that the law is clear that replacement value is what needs to be proved. The Court directed the witness to answer defense attorney's question. The witness stated that he could not testify to the value of the two-year old unit that was taken, but could only testify to the replacement value. (RR Vol. 3, p. 61-64)

On redirect-examination, Mr. Horsack reiterated that the church had not

replaced the air conditioning unit since the parsonage was not occupied and therefore, was not a priority. The witness testified that the church had not given consent for removal of the air conditioner. (RR Vol. 3, p. 64-65)

David Smith, Sheriff of San Augustine County for over six years, was called as the next witness. (RR Vol. 3, p. 66-102) The Sheriff stated that some air conditioning units had been stolen from the southern part of San Augustine County, and informants from Angelina County had told him that an individual in Zavalla may have taken the units. The informants were Tim and Tammy Francis, next-door neighbors to appellant. The Sheriff testified that the informants had said appellant was leaving late at night and taking air conditioners from different places, including San Augustine County. The Sheriff located the appellant's residence, and told his deputies to look for the appellant's vehicle entering San Augustine County. Tim and Tammy Francis lived in a mobile home directly next to appellant's mother's mobile home. (RR Vol. 3, p. 67-69)

The Sheriff testified that he initially rode by appellant's property in the first part of May, and did not see any air conditioners at the property. The Sheriff received a call from Tammy Francis on Friday evening prior to this incident, where she stated that appellant was leaving and heading to San Augustine County. The Sheriff and a Deputy were already patrolling, so they went to the county line, but never saw appellant. The Sheriff testified that they then entered Angelina County, parked and waited for appellant. Between 10 and 11 p.m., the Sheriff did see appellant's truck turn south toward Zavalla and return approximately 2 to 3 a.m. with the bed of the truck being empty. The Sheriff could not identify the driver. (RR Vol. 3, p. 70-72)

The Sheriff received another call from Tammy Francis on Sunday night saying that the appellant was gone but she did not know where he went. On

7.

Monday morning the Sheriff drove near appellant's residence, and observed appellant's yard. The Sheriff testified that he observed an air conditioning unit and a tarp covering what he believed to be additional units. He then called the Angelina County Sheriff's Office. Two detectives from the Angelina County Sheriff's Office met Sheriff Smith and they travelled to appellant's residence. The Sheriff observed appellant disassembling an air conditioning unit, and three more units sitting on the ground. One of the units was fairly new.  (RR Vol. 3, p. 73-77)

State's Exhibit Nos. 7 through 12, photographs of appellant's residence were admitted. State's Exhibit No. 7 showed appellant's truck and residence. State's Exhibit No. 8 is a photograph showing three air conditioning units and a hacksaw. State's Exhibit No. 9 is a photograph showing appellant and an air conditioning unit with a blue tarp on it. State's Exhibit No. 10 is a photograph showing the disassembled unit. State's Exhibit No. 11 is a photograph of a bucket containing wire, copper fittings and other parts and State's Exhibit No. 12 shows an air conditioner line that appears to be cut with a hacksaw. The Sheriff opined that another air conditioner unit appeared to be cut with a pair of bolt cutters or a small cutter where it pinched the line. (RR Vol. 3, p. 78-82)

The Sheriff testified that in his experience, stolen air conditioning units are taken by removing breakers, cutting its lines with bolt cutters or a hacksaw and then removing the unit. The Sheriff opined that a professional would probably use a tubing kit to cut the copper lines. (RR Vol. 3, p. 83)

The Sheriff stated that he spoke with appellant's wife, Jana Crawford. The Sheriff testified that Mrs. Crawford said that they had gotten the air conditioning units from a burned shop or burned residence in Houston that they had owned. Mrs. Crawford stated that they intended to sell the units to a friend, an air conditioning guy in Houston named Leslie Johnson. Mrs. Crawford then provided

8.

the Sheriff with Mr. Johnson's phone number. The Sheriff then called Mr. Johnson and asked if he knew appellant. The Sheriff stated that Mr. Johnson said he had spoken to appellant, had purchased an air conditioner from him, and would provide the Sheriff with identifying information for the air conditioner when he returned to his place of business. Mr. Johnson did provide the serial number and model number of the unit he purchased from appellant after the Sheriff returned to San Augustine County. Sheriff Smith provided this information to Detective Farmer of Angelina County. The Sheriff testified that Detective Farmer had informed him that the unit Mr. Johnson purchased from appellant was the unit taken from Shady Grove Church. (RR Vol. 3, p. 85-90)

On cross-examination, Sheriff Smith testified that when he first went to appellant's residence, he was unaware that Timmy and Tammy Francis were being evicted by appellant's mother. The Sheriff was also unaware that appellant had recently lived in Houston, Texas. The Sheriff admitted that appellant had said his house had recently burned down, and one of the air conditioning units had come from that house. The Sheriff also admitted he had been told another unit had come from his mother's trailer where a tree had fallen across it and that appellant was trying to restore air conditioning to his mother's trailer. (RR Vol. 3, p. 90-92)

Sheriff Smith testified that when he first crossed into Angelina County to surveil appellant, he did not give the Angelina County Sheriff's Department a courtesy call. He stated that Sheriffs can cross county lines at will, without notice. (RR Vol. 3, p. 93) The Sheriff stated that although the Angelina County supplemental incident report indicated that Sheriff Smith had surveilled appellant on Sunday, June 29, 2014, some unidentifiable miscommunication had occurred since Sheriff Smith had not been in Angelina County on Sunday. The Sheriff testified that he had not used Timmy and Tammy Francis as informants before and

9.

was aware of the Francis' reputation for stealing. When the Francis' contacted the Sheriff, they told him "they was tired of being accused of doing all the stealing across the bridge, that is was not them doing the stealing, it was appellant." The Sheriff could not account for the reliability of the Francis, except for in this case. Initially, the Francis' had contacted the Sheriff's neighbor about stolen units. One of the San Augustine County stolen air conditioning units was taken from the Sheriff's wife's real estate office. (RR Vol. 3, p. 94-97) The Sheriff did recall that appellant's mother's trailer air conditioning unit was missing, but did not identify which of the four units was originally her house unit. The Sheriff also did not identify which unit was associated with his burned residence. The Sheriff did not research the value of the Shady Chapel air conditioning unit, but knew units cost $2,800 to $3,500. (RR Vol. 3, p. 98-100)

On redirect-examination, Sheriff Smith stated that he could not see how the Francis' might be involved since they did not have a vehicle at the time. (RR Vol. 3, p. 100-101)

On recross-examination, the Sheriff stated that he had never tried to pick up an air conditioning unit, but from the photographs, he would think that one person could not lift a unit by himself. (RR Vol. 3, p. 102)

Mr. Leslie Johnson, an air conditioning man from Houston, Texas, was called as the next witness. (RR Vol. 3, p. 102-135) Mr. Johnson testified that he repaired and sold air conditioning units out of his garage in Houston. State's Exhibit No. 13 and 14, advertisements for Mr. Johnson's business in the Greensheet were admitted. Mr. Johnson stated that he had met appellant, but did not know him. Mr. Johnson testified that he had received a call from Jana Crawford asking whether he wanted to buy an air conditioner from a burned house. At first he did not want the unit, but Mrs. Crawford was persistent and he

10.

eventually met her and bought the unit. Mr. Johnson testified that they met in the parking lot of Greenspoint Mall in Houston. Mr. Johnson testified that this was the first and last time he had met appellant and Mrs. Crawford. When Mr. Johnson met appellant, they talked about appellant's house that burned down and that appellant needed to sell the unit. Mr. Johnson paid $100 or $120 for the unit and a scrap unit that appellant threw in for approximately $20. The intact unit was a 2012 unit using 410 refrigerant as identified by its data plate. Mr. Johnson took the units home and placed them in his garage.(RR Vol. 3, p. 104-110)

State's Exhibit No. 15, a photograph of Mr. Johnson's garage was admitted. (RR Vol. 3, p. 111) The photograph shows both the newer unit and the junk unit. Mr. Johnson testified that somebody from the San Augustine Sheriff's Department contacted him and then someone from Angelina County Sheriff's Department contacted him and told him the newer unit was stolen and asked if they could retrieve it. Mr. Johnson stated that he asked appellant whether the air conditioners were stolen, which appellant denied. Mr. Johnson testified that the Sheriff's department emailed him pictures to identify the appellant. (RR Vol. 3, p. 113-116)

On cross-examination, Mr. Johnson admitted to being convicted in 1976 for possession and in the 1980s for writing a bad check. Mr. Johnson has been licensed to work on air conditioners for three to four years. (RR Vol. 3, p. 117-118) Mr. Johnson stated that he had not provided appellant with a receipt for the units. Mr. Johnson stated that in 2012 he would have been able to purchase a comparable unit from Johnson Air Supply for about $500 to $600, and could probably still buy the same size unit with older refrigeration (RR Vol. 3, p. 121) with a ten-year warranty on the compressor for $200 or $300. Mr. Johnson viewed State's Exhibit No. 6, the estimate of replacement of the church's unit and stated that, with typical markup, the estimate of $2,012 would be feasible. Mr. Johnson testified that he might pay

11.

$597 for a new unit, or for a scratch and dent model $400, but markup can range from 100 to 500%. (RR Vol. 3, p. 120-122) Mr. Johnson testified that he might have charged $1000 for the unit since it was used. Mr. Johnson opined that another company might have been able to charge up to $1,500 for the same unit. The witness stated that had the unit been new, he might have been able to charge $2,500 to $3,000. (RR Vol. 3, p. 123) Mr. Johnson stated that he had purchased another older unit from appellant on another occasion when they met at a Foodtown parking lot. Mr. Johnson stated that on another occasion he had received a "Freon will-call" from appellant, which is where the witness would purchase the Freon wholesale, and appellant would pick it up and pay for it. Mr. Johnson recalled that appellant had told him he was putting a unit on his mother's house but could not afford Freon. Mr. Johnson stated that certain types of Freon must be purchased by a licensed entity. The witness estimated the weight of a unit to be from 50 to 100 pounds, and can be handled by an individual. (RR Vol. 3, p. 124-126) Mr. Johnson stated that he had tried to discourage buying the unit because Mrs. Crawford was asking $300, which is what he would pay for a new scratch-and-dent unit in the box. (RR Vol. 3, p. 127) Mr. Johnson viewed State's Exhibit Nos. 8 and 10 and did not recognize any of the units in the photographs as the units he purchased from appellant. (RR Vol. 3, p. 128)

Mr. Johnson described the steps he would take to move an air conditioning unit. The witness said he would trap the refrigerant, if possible, "close it off, backseat my service portion, then you cut it up." The tubes can be cut using a hacksaw or tubing cutters, which the factory prefers, because tubing cutters reduce pits and burrs that can get in the compressor and damage it. (RR Vol. 3, p. 129-130)

On redirect examination, Mr. Johnson stated that State's Exhibit No. 6,

12.

showing an estimate of $2,000 for a brand new Rudd unit was typical. The witness stated that he would not charge $2,000 for a used unit, and that he would charge $400 to $600 for a new Rudd unit, potentially $1,000 if he installed it. Mr. Johnson testified that State's Exhibit No. 12 showing the cut tubing on an air conditioning unit appeared to be a rough cut that might result from using a hacksaw. The witness reiterated that he had purchased the air conditioning unit from the church and a scrap unit, and an older unit at a different time from appellant. The witness testified that the appellant had called him in the morning and told him appellant was trying to put a unit in at his mother's house and he was wanting to get some Freon, and that appellant had other units. Mr. Johnson stated that he thought that appellant was trying to sell the other units, but that he did not need additional units. Mr. Johnson told appellant that he would put the Freon on will-call in Houston and appellant would have to pick it up in Houston. (RR Vol. 3, p. 130-135)

Detective Rapsilver, of the Angelina County Sheriff's Office has been in law enforcement for eleven years. (RR Vol. 3, p. 135-186) Detective Rapsilver stated he was informed by his sergeant to contact the San Augustine Sheriff regarding some stolen air conditioners in Angelina County. The Detective contacted Sheriff Smith and then met with him near Zavalla. He stated that Sheriff Smith told him a criminal informant said that appellant had been involved in stealing some air conditioner units. Sheriff Smith stated that he recently surveilled the appellant and had seen appellant that morning standing near several air conditioning units. The Detective and Sheriff Smith then travelled to appellant's residence and observed appellant and several family members standing beside a black Ford truck. (RR Vol. 3, p. 137-139) When talking to appellant, the Detective observed several air conditioning condensing units partially covered with a blue tarp beside appellant's truck as seen in State's Exhibit No. 8. Additionally, the Detective noted a hacksaw

13.

in State's Exhibit No. 8. Detective Rapsilver noted in State's Exhibit No. 11, that all units had similarities in how they were removed, and also noted "disassembled wire and copper tubing." The Detective stated that in his experience, when air conditioners are stolen, the copper tubing is cut without using a tubing kit and wiring is cut. State's Exhibit No. 10 shows an air conditioning unit located in the bed of appellant's truck that has been disassembled. (RR Vol. 3, p. 141-142) The Detective stated that appellant told him that two units were obtained from his residence that recently burned down in Houston and he had purchased one from a man named Leslie. The witness testified that appellant did not give contact information for Leslie. The Detective stated that Sheriff Smith obtained contact information for Leslie from Jana Crawford. (RR Vol. 3, p. 143-145)

Detective Rapsilver stated that while he was questioning appellant, Sheriff Smith was separately interviewing Mrs. Crawford, and that the purpose for separately interviewing suspects is to obtain more truthful information. In the Detective's opinion, appellant was not providing Leslie's contact information for a reason. The Detective stated that he did not know whether appellant was in the air conditioning business nor whether appellant was employed. The Detective estimated that appellant had approximately $8,000 worth of air conditioning equipment at his residence and that he believed appellant told him that he recently moved in to his parent's house. The Detective testified that appellant had told him that his home in Houston had burned down. Before leaving appellant's residence, Sheriff Smith contacted Leslie Johnson who denied selling an air conditioner to appellant, but had recently purchased an air conditioner from appellant. The Detective stated that Mr. Johnson eventually provided the make and serial and model numbers to Sheriff Smith who relayed the information to the Detective. Once the Detective obtained this information, he confirmed that the make, model

14.

and serial numbers were the same as the unit stolen from the Shady Chapel Church parsonage. The Detective had obtained the make, model and serial number of the stolen church air conditioner from a report filed several weeks prior from an unsolved crime. (RR Vol. 3, p. 145-153) The Detective stated that at this time, he was attempting to corroborate the appellant's story and did not arrest appellant. (RR Vol. 3, p. 154)

State's Exhibit Nos. 17 through 20, photographs of air conditioning units located at appellant's residence were admitted. State's Exhibit No. 17 is a photograph of a unit that appellant stated came from his burned residence. The Detective stated that he did not see any fire damage to the unit. State's Exhibit No. 18 is a photograph of a secondary unit that does not show any fire damage. The Detective stated that State's Exhibit No. 19 is a photograph of wiring from one of the units that appears to be cut. State's Exhibit No. 20 is a photograph of copper coming from the same unit that had been cut. The Detective testified that all three units had the same kind of marking or cutting, which is also shown on State's Exhibit No. 12. (RR Vol. 3, p. 155-157) Detective Rapsilver testified that the Shady Chapel Church theft case had been open for approximately a month and a half at this time, and that the appellant had been identified as a person of interest. Once the Detective matched the serial number from the church theft and the unit that Mr. Johnson had, he made arrangements to retrieve the unit from Mr. Johnson. The Detective identified State's Exhibit No. 15 as a photograph of Mr. Johnson's residence and the church air conditioning unit in his possession, stating that he did not see any fire damage to the unit. State's Exhibit No. 16, a photograph of the church air conditioning unit's serial identification tag was admitted. (RR Vol. 3, p. 158-161) The Detective stated that the unit was returned to Mr. Horsack at the church. The witness testified that he then asked Mr. Johnson to view a photograph

15.

array of six individuals, including appellant, and identify whether the person that sold him the unit was included in the array. The witness stated that Mr. Johnson identified appellant as the person who sold him the unit. At this time, the Detective obtained a warrant for appellant's arrest for the theft of the Shady Chapel Church air conditioning unit. (RR Vol. 3, p. 162-163)

On cross-examination, Detective Rapsilver stated that the information that he received from Sheriff Smith was that he had been surveilling appellant and that appellant was involved in stolen air conditioning units, but that he may have been unclear as to the actual dates and times of Sheriff Smith's activities, accounting for inconsistencies in his report. The Detective stated that when he was questioning the appellant at his residence, he could not recall whether appellant had a cell phone but appellant clearly did not know Leslie's last name. The Detective, from his memory, did recall hearing that appellant's mother's unit had recently failed from a branch falling on it, and did recall a working unit attached to the home. The defense attorney indicated that Sheriff Smith recalled a slab near appellant's mother's home without a unit. The Detective stated that it was possible that there was a slab closer to the end of the trailer where the unit used to sit, and he did recall observing that a branch had fallen near the home. (RR Vol. 3, p. 164-167) The Detective testified that he had spoken to Tim and Tammy Francis and was familiar with their bad reputation, but that they were not suspects in this case. The Detective stated that he was unaware that Mrs. Guidry initially indicated that the Francis' might be involved, had not spoken with Deputy Biggerstaff who took the initial report, nor Detective Nichols who was initially assigned to investigate the case. The Detective also did not read the initial report or any other information that had been in the initial report. (RR Vol. 3, p. 168-169) The Detective stated that the

16.

origin of the unit in the back of the appellant's truck was not determined. (RR Vol. 3, p. 170) The Detective stated that he did not see any fire damage on any of the units, but that a unit located outside of a burned brick house would not necessarily have signs of fire damage. The Detective stated that they had seized the three units from appellant's residence for safekeeping since none of them had been reported stolen according to their serial numbers. (RR Vol. 3, p. 171-172) The Detective stated that although appellant's mother and brother were at the residence, the Detectives did not focus on questioning them. The witness did state that appellant's brother believed the units were stolen, but did not say who might have stolen them. Based on his experience, when air conditioning units are stolen, the copper tubing is cut with a hacksaw and the wiring is cut instead of unhooked from the side of the house. (RR Vol. 3, p. 174-175) Regarding the three units located at appellant's residence, appellant had told the Detective that one was purchased from Leslie Johnson, and the other two were retrieved from his burnt house in Houston. The Detective agreed that although Mr. Johnson purchased the air conditioner, he was in possession of stolen property. The defense attorney asked the Detective if a man could "really expect to pay $120 for a two-year-old unit whether he bought it from Mr. Crawford or anyone else." The State objected due to calling for speculation. The Court directed the witness to answer the question. The Detective responded that everyone has the right to sell their property for whatever price they dictate, and in this case, Mr. Johnson felt he was buying appellant's property because he had a need. (RR Vol. 3, p. 175-178) The Detective stated that he estimated the value of $8,000 for all four units was derived from the replacement cost of the church's unit as provided by the church. The defense attorney noted that an earlier estimate by the victim stated that replacement cost was $5,000, and asked the Detective to explain why the Sheriff's Office relied on the lower estimate of $2,100 contained

17.

in State's Exhibit No. 6. The Detective stated that in his experience, victims initially often give a rough estimate and revise that estimate when they have the opportunity to review receipts or obtain quotes. The Detective testified that he reduced his estimate to $3,000 based on either the information he received from the church or performing an independent investigation, but he did not recall which. (RR Vol. 3, p. 179-181) Detective Rapsilver stated that he did not attempt to corroborate whether appellant's Houston house did burn down. He also stated that he did not attempt to determine whether appellant was employed and was unaware that appellant was receiving regular checks from employment since 2013 through May 2014. (RR Vol. 3, p. 182-183)

On redirect-examination, the Detective stated that they continued to look for the rightful owners of the other units, and one was determined to have been stolen from Jasper County. (RR Vol. 3, p. 184) The State rested. (RR Vol. 3, p. 186)

Defense counsel moved for a directed verdict and dismissal on the basis that the State had failed to prove the allegation as charged in the indictment, specifically in regards to the value of the air conditioning unit that was in issue. The Court denied the motion. (RR Vol. 3, p. 186-187) Defense counsel stated that he had advised his client not to testify based on the notice of the State under 401 of the potential history of convictions that could be used in this case and that it would not be in the appellant's best interest to testify in this case. Defense counsel stated that he had advised the appellant that his past convictions could be used for impeachment evidence and that the State would be allowed to inquire into each and every conviction or judgment of conviction. The Court asked appellant whether he understood that criminal history, a felony criminal history or a crime involving moral turpitude could be brought up by the State. The appellant replied that he understood but that his history was 25 to 26 years old, and stated that he wanted to

18.

confer with his attorney. The Court informed the State and defense that the parties would be walking a fine line because appellant's mother planned on testifying. If appellant's mother stated that appellant was a good boy, then the State could ask whether she was aware that he was convicted of several crimes. The Court admonished the attorneys to make sure the appellant's mother did not bring up character. The Court also indicated that the State could ask whether appellant's mother knew appellant's reputation in the community, and the Court would not speculate as to her response but would deal with that issue if it came up. The Court indicated that appellant could then make a decision on whether to testify. (RR Vol. 3, p. 187-190)

Defense counsel recalled Mr. Leslie Johnson. (RR Vol. 3, p. 191-197) Mr. Johnson stated that he did not recall the date that he purchased the air conditioning unit from appellant but that it had been about a year ago. Mr. Johnson stated that he paid cash out of his pocket for the unit. The witness said he placed the Freon on will-call two to three weeks after he purchased the unit from appellant. Mr. Johnson testified that he received a call from Jana Crawford around lunch and they met later that day at Foodtown where he paid about $120 for the unit and the scrap unit. He believed he purchased another air conditioner at another time within about a week from appellant for about $30 or $40. Mr. Johnson stated that the order of contact with appellant was meeting at Foodtown, then Greenspoint, then arranging the Freon will-call. Mr. Johnson stated that the church air conditioner was worth about $100 to him. A new unit would be worth about $500 to him, but to someone else it may be worth $600 to $800. (RR Vol. 3, p. 191-196)

Hazel Crawford, appellant's mother was then called as a witness. (RR Vol. 3, p. 197-211) The witness stated that she was the Francis' landlady and had rented a trailer to them for about three months. Hazel Crawford testified that the Francis'

19.

would not pay the rent or the bills. She had approached the Francis' and told them they would have to leave, and they laughed it off. She stated that the Francis' had stolen a DVD player from her, and could not specifically identify all of the items they had stolen from her. Hazel Crawford testified that the Francis' had also stolen the electrical wire out of the trailer when they left. The witness stated that appellant lived with her sometime in 2014. Hazel Crawford testified that she was aware that the appellant's Houston house had burned down, and the investigator determined it burned due to a short in the air conditioner or central air unit. She had seen the house after it burned. (RR Vol. 3, p. 197-199) Defendant's Exhibit No. 1A through E, photographs of appellant's Houston house, were admitted. Hazel Crawford stated that when appellant was living in Houston, he was working as a contractor, remodeling. She also recalled that when appellant moved in with her, he was working in Lufkin. Hazel Crawford testified that a tree fell on her air conditioning unit and "squashed" it. She did file and receive insurance for the unit, but did not recall the amount received. She also could not remember when the damage to her unit occurred. She did recall that the appellant was going back and forth between Zavalla and Houston. (RR Vol. 3, p. 199-203)

On cross-examination, Hazel Crawford stated that she thought appellant's Houston house had three bedrooms, but she was not sure. She described that the air conditioner was located in a little hallway in the house. She believed that there was only one unit in the house. Hazel Crawford agreed that the fire damage was extensive. Ms. Crawford stated that the air conditioning unit was probably "smutted" based on the damage to the house. (RR Vol. 3, p. 203-205) Hazel Crawford stated that appellant lived with her approximately six months to a year. When he moved in, he brought some clothes. Appellant also has a truck, but the

20.

witness did not recall a trailer. She did not recall whether appellant brought air conditioner units with him when he moved to Zavalla. She was unclear whether the appellant currently had a job. (RR Vol. 3, p. 207-208)

At bench conference, defense counsel informed the State and the Court that the witness had had three brain surgeries. The Court stated that it did not want the witness to testify that the appellant was in jail. The State stated he would move on. (RR Vol. 3, p. 208-209)

Hazel Crawford stated that she had had about ten brain surgeries and had trouble remembering things, especially dates and times. (RR Vol. 3, p. 209)

On redirect examination, Hazel Crawford stated that appellant's Houston house had outside and inside pieces to the air conditioning unit. She stated that the fire had started from a wire hanging down near the inside portion of the air unit. The witness also stated that appellant had a large shop by his Houston house. (RR Vol. 3, p. 210-211) The Defense rested. (RR Vol. 3, p. 212)

The court read the charge to the jury. (RR Vol. 3, p. 216-225) After closing arguments, the jury deliberated. (RR Vol. 3, p. 225-253) The jury returned a verdict of guilty of the State Jail offense of theft as charged in the indictment. (RR Vol. 3, p. 253-254) Defense counsel moved to set aside the verdict on the basis of value. The Court stated it would take up the motion at a later time. (RR Vol. 3, p. 254)

Defense counsel moved to set aside the verdict based on *Smiles v. State*, 298 S.W.3d 716 at 720, Tex. App.—Houston, 14th District, 2009, no pet. State's argument is based on the mistaken premise that replacement cost is the same as the cost required to make the complainant whole again. The Penal Code §31.08 requires the State to prove the value of the property actually stolen, the value of the

21.

property rendered worthless or damaged or potentially relevant to a criminal prosecution is simply not the appropriate calculation a theft prosecution. The Court denied defense counsel's motion to set aside. (RR Vol. 3, p. 255)

A sentencing hearing was held on June 25, 2015. (RR Vol. 4, p. 4) The State reoffered all exhibits admitted during the trial. The State stated that appellant had pled true to the enhancements. State's Exhibit Nos. 1 and 2, judgments for the enhancement counts, were offered and admitted. The Court took judicial notice of the entire file. The appellant pled true to the two judgments offered, changing the punishment range from a state jail felony to a second-degree felony. (RR Vol. 4, p. 4-6) The State stated that he would not call any witnesses. (RR Vol. 4, p. 7)

Defense counsel called Melvin Hicks of Angelina County Adult Probation Department, which performed the presentence investigation report. (RR Vol. 4, p. 7-15) Mr. Hicks stated that the appellant was cooperative, but appeared to have a dual addiction for alcohol and methamphetamines. Mr. Hicks stated that appellant went to treatment once for a 30-day period. Mr. Hicks stated that appellant had been working for Aspen DCI and had received a letter from them indicating that appellant was eligible to return to work upon release. In this type of case, Mr. Hicks testified that probation options may include drug court, code call-ins, which is a random UA system, and theft class. While collecting information for the PSI, Mr. Hicks had discussed with appellant his recent hardships, including the loss of a child and loss of his home from fire, but found that appellant was involved in a committed marriage. (RR Vol. 4, p. 7-10)

On cross-examination, Mr. Hicks stated that he had been a probation officer for eight years. During the PSI, Mr. Hicks spoke with appellant and his wife on numerous occasions. Mr. Hicks was not aware that Mrs. Crawford had eight previous arrests involving thefts and forgeries. Mr. Hicks agreed that he could not

22.

supervise the appellant 24/7, appellant would make his own choices, and appellant had been arrested about 16 times. Mr. Hicks agreed that appellant had been sentenced to the penitentiary in 1986 for six years for impersonating a police officer and for five years for burglary of a habitation in 1989. Mr. Hicks agreed that appellant had a possession of a controlled substance in 1991 and another misdemeanor theft in 2014, for which he received jail time. The State also asked whether appellant had a burglary in 1987, an unauthorized use of a vehicle in 1987. The defense attorney objected to introduction of the 1987 arrests as to the confrontation clause and not being allowed to interrogate any witnesses without judgments. The Court responded by taking Judicial Notice of the PSI. Mr. Hicks stated that appellant had been on probation before that provided opportunities for rehabilitation and antitheft classes. Mr. Hicks agreed that had appellant taken advantage of such programs in the past, he may not be in court today. (RR Vol. 4, p. 10-14)

Mr. Hicks stated that appellant expressed remorse for his actions that he was addicted to methamphetamines beginning in 2014, which led to a "crime wave". (RR Vol. 4, p. 15)

Randy Crawford, Jr., also known as RJ, son of appellant was then called. (RR Vol. 4, p. 15-25) RJ testified that he had written a letter to the Court. He stated that he believed appellant was a good dad, tried to teach him, imposed discipline, and they are close. RJ has been working offshore for the last two years. RJ testified that the appellant's best quality is that he is helpful and has a big heart. He stated that appellant does have an alcohol problem. RJ stated that appellant had taken in three other children and raised them as his own. The witness stated that appellant had not been incarcerated since he went in 1989. RJ stated that he was aware of

23.

what the appellant had been convicted of, knew it was wrong and felt it was out of character for appellant, but that appellant had worked most of his life, provided his family shelter, put him through high school and put food on the table every day. RJ testified that he had moved to live with his grandmother when he was 15 because appellant was too strict, but believes he should have stayed with appellant. (RR Vol. 4, p. 16-21) RJ testified that he thought appellant had gotten involved with drugs and believed his cousin, Dustin Ross, was involved. (RR Vol. 4, p. 21) RJ does not believe that appellant stole the air conditioners. (RR Vol. 4, p. 22)

On cross-examination, RJ stated that he had been convicted of evading and assault. RJ stated that his opinion of the appellant is a law abiding, peaceful citizen regardless of his interactions with the law. The State attempted to list appellant's convictions. The Court took Judicial Notice and allowed the witness to state his opinion. (RR Vol. 4, p. 23-25)

Annie Bednarik, appellant's niece was called as the next witness. (RR Vol. 4, p. 25-32) Mrs. Bednarik stated that she had also written a letter to the Court. She stated that appellant was always the leader of her family that her father was not present, and appellant took the place of her father. The witness testified that she started living with appellant when she was ten or eleven, until she was fifteen. Mrs. Bednarik stated that appellant also raised her younger brother. The witness stated that she put appellant on a pedestal, he was very Christian, they grew up in church, and appellant supported them and was there for them. Mrs. Bednarik stated that appellant's conviction "blew me away." She stated that she had not been as close to him in the last several years. When she left at fifteen, she also went to live with her grandmother, who had trouble disciplining them, so she got into trouble. Mrs. Bednarik stated that she believed that appellant had issues with drugs and alcohol

24.

and would never steal anything if he was in his right mind. She asked the court to consider the appellant's whole picture and that appellant needs a little help. (RR Vol. 4, p. 26-30)

On cross-examination, Mrs. Bednarik stated that she felt RJ's testimony was truthful, but that she did not have knowledge of appellant's recent activities. (RR Vol. 4, p. 30-31)

Jana Crawford, appellant's wife of 25 years was called as the next witness. (RR Vol. 4, p. 32-42) Jana Crawford stated that appellant did not have any difficulties after being released from prison until 2011 when they lost custody of their great niece, an eight-year-old child that they had raised. The Court awarded her father custody since he decided he wanted custody of her and ordered no contact with appellant and Jana Crawford to allow the child to bond with her father. Jana Crawford testified that over the last year and a half, they had lost the great niece, appellant had lost his job with GE, their house burned down, and they had to sell their horses. They moved back to East Texas after the house burned down on April 28, 2012, and appellant's drinking got worse. Regarding Dustin Ross, Jana Crawford stated that he would request help and often leave the helper with stolen property, but she and appellant are no longer on good terms with him. Jana Crawford testified that she believed appellant needs grief counseling and alcohol and drug counseling. (RR Vol. 4, p. 34-38)

On cross-examination, Jana Crawford admitted to a conviction for theft in 1996 and forgery in 1997, and theft in 2014, which was dismissed. The witness stated that she and appellant did not know Dustin Ross was involved in criminal activities when appellant was helping him. Jana Crawford stated that appellant had a reputation of being a law abiding, peaceful citizen, but his reputation had recently gotten bad. (RR Vol. 4, p. 38-42)

25.

Randy Earl Crawford, Sr., the appellant, was then called as a witness. (RR Vol. 4, p. 42-56) The appellant admitted the theft and that he knew it was wrong, but that he thought it was a misdemeanor and did not want to cause a hardship on somebody else. The appellant stated that he had recently taken responsibility for another misdemeanor where he did not take probation because he had credit for time served, and it was a matter of convenience to take responsibility. He stated that in this case he had pled not guilty because he strongly believed the value of the property fell within a misdemeanor charge. The appellant stated that he took the unit, that he could not keep a job here, that he was working in Houston, that he was on his way to Houston for his job but did not have enough money for food or gas for the week until he received his check. Appellant testified that he had no idea that the house was a church parsonage and thought it was just a vacant house. Appellant stated that after going to prison and ten years probation, he had lived for over 25 years being a husband and father, but had recently fallen on hard times from losing a child, a job and a home. The witness testified that he would be able to return to work at Aspen in Lufkin as a welder. He had completed his ten-year probation without incident. (RR Vol. 4, p. 43-48) The appellant stated that after selling three items for Dustin Ross, he realized something was wrong and went to the Tyler County Sheriff, made apologies, cooperated with them and made some undercover buys for them. (RR Vol. 4, p. 49) The appellant stated that he has been in jail for five months, he needs to go back to work, he is a man of faith, but had turned from God, he is clean and sober, but needs help to deal with his addictions to alcohol and methamphetamines. (RR Vol. 4, p. 50-51)

On cross-examination, appellant admitted that there were three other stolen units at his residence. Appellant stated that no one else was involved in the theft of this unit. Appellant explained that two years after he lost the child and home, he

26.

progressively had more trouble getting out of bed to go to work and was having trouble keeping a job. Appellant admitted that taking someone else's property was wrong. Appellant stated that he had taken responsibility in the past, had pled guilty to everything he had done. (RR Vol. 4, p. 51-56)

On redirect examination, appellant stated that he was out on bond from June until February and did not steal anything during that time. (RR Vol. 4, p. 57-58) Defense counsel rested. (RR Vol. 4, p. 58) The trial court sentenced appellant to confinement in the Texas Department of Criminal Justice System Institutional Division for a period of 15 years. (RR Vol. 4, p. 58)

Defense counsel stated that he would file a Notice of Appeal and a Motion to Withdraw. (RR Vol. 4, p. 59)

## SUMMARY OF THE ARGUMENT

The evidence is legally insufficient to sustain the jury's finding of appellant's guilt for the offense of theft as alleged in the indictment. Pursuant to TPC Sec. 31.08, the State must prove the value of the item alleged stolen by evidence of the fair market value of the property at the time of the offense or if the fair market value of the property cannot be ascertained, the cost of replacing the property. The State improperly focused their evidence on the replacement value of the property instead of the fair market value. The lack of evidence presented at trial of the fair market value of the property at the time of the theft prevents appellant's conviction for a State Jail Felony.

Appellant argues even when viewing the evidence in a light most favorable to the finding of guilt by the jury that the finding is insufficient to sustain the jury's verdict and is not rational or supported by "more than a mere modicum of evidence." Appellant argues the evidence supports he should only have been found

27.

guilty as to the offense of theft classified as a Class B Misdemeanor instead of a State Jail Felony. Further, as support, appellant offers the testimony of various witnesses and exhibits, which support the fact that the State failed to prove the value of the stolen property to meet the threshold of a State Jail Felony conviction.

## ARGUMENT

**The evidence is legally insufficient to sustain the jury's finding of appellant's guilt for the offense of theft classified as a State Jail Felony**.

Appellant argues the evidence is legally insufficient to sustain the jury's finding of guilt for theft as a State Jail Felony-enhanced, because the testimony regarding the value of the stolen property did not comply with the statutory requirements necessary to support a State Jail Felony-enhanced conviction.

The State's indictment was pursuant to

Texas Penal Code 31.03

**(a)** A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property.
**(b)** Appropriation of property is unlawful if:
    **(1)** it is without the owner's effective consent
 **(e)** Except as provided by Subsection (f), an offense under this section is:
    **(2)** a Class B misdemeanor if:
        **(A)** the value of the property stolen is $100 or more but less than $750;
        **(B)** the value of the property stolen is less than $100 and the defendant has previously been convicted of any grade of theft; or
        **(C)** the property stolen is a driver's license, commercial driver's license, or personal identification certificate issued by this state or another state;
    **(3)** a Class A misdemeanor if the value of the property stolen is $750 or more but less than $2,500;
    **(4)** a state jail felony if:
        **(A)** the value of the property stolen is $1,500 or more but less than $20,00

28.

Texas Penal Code Section 31.08

**(a)** Subject to the additional criteria of Subsections (b) and (c), value under this chapter is:

**(1)** the fair market value of the property or service at the time and place of the offense; or

**(2)** if the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the theft.

**(c)** If property or service has value that cannot be reasonably ascertained by the criteria set forth in Subsections (a) and (b), the property or service is deemed to have a value of $500 or more but less than $1,500.

In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-19 (1979); Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 31, supra. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." Hooper, 214 S.W.3d at 13, supra. Lucio v. State, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011). Finally, it is well established that the fact finder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. Chambers v. State, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

Appellant would argue that even in reviewing the evidence in a light most

29.

favorable to the verdict, it is insufficient to sustain the jury's finding of guilt. As this court is well aware "legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction." Escobedo v. State, 6 S.W. 3d 1, 6 (Tex. App.- San Antonio 1999, pet. ref'd) citing Jackson v. Virginia, 443 U.S. 307, 315-15,99 S. Ct. at 2781, 2786-88,61 L. Ed.2d 560 (1979). Appellant argues no rational trier of fact could have found the essential elements of the offense in the instant matter beyond a reasonable doubt. (Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Lacour v. State, 8 S.W. 3d 670,671 (Tex. Crim. App. 2000).

Appellant argues the element of value was not met regarding Appellant's theft. A conviction for theft classified as a State Jail Felony requires proof that the fair market value of the stolen property was greater than $1,500 but less than $20,000. Tex. Penal Code Ann. § 31.03(e)(4) (West 2011). Fair market value is the amount of money that the property would sell for in cash, given a reasonable time for selling it. Keeton v. State, 803 S.W. 2d 304, 305, (Tex. Crim. App. 1991). Either the owner of the property or a non-owner may give testimony regarding an item's value. Sullivan v. State, 701 S.W. 2d 905, 908 (Tex. Crim. App. 1986). An owner's testimony regarding the value of property is an estimation of the property's fair market value. *Id.;* Jones v. State, 814 S.W.2d 801, 803 (Tex. App.—Houston [14th Dist.] 1991, no pet.). The evidence offered by the State regarding the value of the stolen property does not meet the requirements for determining value of stolen property that is punishable by a State Jail Felony. Because of this, appellant argues that he should have been convicted for theft classified as either a Class A or Class B Misdemeanor.

The State failed to introduce evidence of the fair market value of the stolen property in the range of prices that would raise the possible punishment to a State

30.

Jail Felony. As noted above, the Texas Penal Code defines value for purposes of theft as the fair market value of the property at the time and place of the offense or if the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the theft. The State and jury incorrectly concentrated on the replacement value of the property in order to raise the value into the State Jail Felony range instead of the fair market value of the stolen property.

The State offered into evidence the testimony of three witnesses regarding the value of the property. Two witnesses were police officers who were not trained nor did work with air conditioner units. The third witness was a dealer in air conditioner units and was treated as an expert for purposes of valuing the air conditioner units in question. The first witness, Deputy Biggerstaff, testified that he asked what the replacement cost might be, and looked for usable evidence, but did not see any evidence. (RR Vol. 3, p. 27). Deputy Biggerstaff further testified that church personnel stated the last time they replaced the unit cost approximately $5,000. (RR Vol. 3, p. 29) Throughout Deputy Biggerstaff's testimony there is no mention of any attempt to estimate the value of the property that was stolen; just what it would cost to replace the property.

The State then called Charles Horsack to testify. Mr. Horsack testified that Parker Refrigeration informed him it would cost $2,112 to replace the missing unit. The Court then admitted State's Exhibit No. 6, an estimate of replacement cost issued by Parker Refrigeration. (RR Vol. 3, p. 51-52) Mr. Horsack also stated that as he understood it, State's Exhibit No. 6 provided an estimate for replacing the air conditioner with a new unit that was the same model as the unit that had been stolen. Mr. Horsack ended his testimony by concluding that he could not testify to the value of the two-year old unit that was taken, but could only testify to the

31.

replacement value. (RR Vol. 3, p. 61-64). Again, the State introduced evidence of estimations only for the value of replacing the property, not the fair market value of the property that was stolen. Mr. Horsack even admitted that he had no idea what the fair market value of the stolen property was because he had only looked into replacement values.

Lastly, the State called Mr. Leslie Johnson to testify. Mr. Johnson stated that he paid $100 or $120 for the unit that was later determined to be the one stolen. (RR Vol. 3, p. 104-110). Mr. Johnson continued by stating that in 2012 he would have been able to purchase a comparable unit from Johnson Air Supply for about $500 to $600, and could probably still buy the same size unit with older refrigeration (RR Vol. 3, p. 121) with a ten year warranty on the compressor for $200 or $300. (RR Vol. 3, p. 120-122). Finally, on redirect examination Mr. Johnson concluded his testimony by estimating that the church air conditioner was worth about $100 to him and a new unit would be worth about $500 to him, but to someone else it may be worth $600 to $800. (RR Vol. 3, p. 191-196). Mr. Johnson's testimony was the only attempt by the State to provide an estimate for the fair market value of the stolen property and the $100 estimate Mr. Johnson provided regarding the stolen property fell well below the range of value necessary for a punishment of a State Jail Felony.

After the jury reached their decision, Defense counsel moved to set aside the verdict based on Smiles v. State, 298 S.W.3d 716 at 720, Tex. App.—Houston, 14th District, 2009, no pet. Defense counsel argued that the State's argument was based on the mistaken premise that replacement cost is the same as the cost required to make the complainant whole again. Id. The Penal Code §31.08 requires the State to prove the value of the property actually stolen, the value of the property rendered

32.

worthless or damaged or potentially relevant to a criminal prosecution is simply not the appropriate calculation a theft prosecution. Id. The Court denied defense counsel's motion to set aside. (RR Vol. 3, p. 255)

The $100 estimate of the air conditioner unit that was determined to be the stolen unit provided by Mr. Johnson was the only evidence the jury should have considered when estimating the value of the stolen air conditioner unit. Appellant disagrees that there was no way to ascertain the fair market value of the stolen property because Mr. Johnson provided such an estimate and no other attempt appears to be have been made to determine the fair market value.

The State should have first exhausted any means of determining and introducing evidence of the value of the stolen property before introducing evidence of the replacement value of the stolen property. Appellant contends that the replacement value of the stolen property was incorrectly taken into account when assessing punishment instead of relying solely on Mr. Johnson's testimony, which was the only evidence of fair market value.

Appellant is aware this court will sustain the conviction "unless it is found to be a verdict that is not rational or not supported by more than a "mere modicum of the evidence." Moreno v. State, 755 S.W. 2d 866,867 (Tex. Crim. App. 1988). Appellant understands this court will not re-weigh the evidence or substitute its judgment for that of the fact finder. Johnson v. State, 967 S.W.2d 410, 412 (Tex. Crim. App. 1998). Appellant realizes that any 'reconciliation of conflicts in the evidence is within the exclusive province of the fact finder. Mosley v. State, 983 S.W.2d 249,254 (Tex. Crim. App. 1998).

In the instant matter, the jury heard from several witnesses as outlined previously and only one gave testimony as to the fair market value of the stolen item. This value fell well below the range of value necessary to sustain a

33.

punishment of a State Jail Felony for theft. The State failed to introduce additional evidence of fair market value of the stolen property. For the reasons stated appellant argues that the evidence is legally insufficient to sustain the jury's finding of guilt of theft classified as a State Jail Felony.

PRAYER

Appellant, Randy Earl Crawford, request that the judgment rendered by the trial court on June 25th, 2015 be reversed and appellant acquitted. Alternatively, appellant request this Honorable court to reform the judgment and find the appellant guilty of theft classified as either a Class B Misdemeanor and remand this matter for sentencing. Lastly, Appellant requests this Honorable Court grant such other and further relief to which Appellant is justly and equitably entitled.

Respectfully, Submitted:

*/S/ John D. Reeves*

JOHN D. REEVES
Attorney at Law
1007 Grant Ave
Lufkin, Texas 75901
Phone: (936) 632-1609
Fax: (936) 632-1640
SBOT # 16723000
Email: tessabellus@yahoo.com
**ATTORNEY FOR APPELLANT**

<strong><u>CERTIFICATE OF COMPLIANCE</u></strong>

I, John D. Reeves Counsel for appellant hereby certify that this brief exclusive of the rule provisions that do not provide counting contains 10,675 words.

*/S/ John D. Reeves*
John D. Reeves
34.

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Appellant's Brief on this 4th day of December 2015 been forwarded to the State's Counsel, April Ayers-Perez, Assistant District Attorney of Angelina County, aperez@angelinacounty.net by regular e-filing.

/S/ *John D. Reeves*
John D. Reeves
Attorney for Appellant,
Randy Earl Crawford

35.